## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____      )
KELLII HELEANA LYNNE PERRY,                )
              Plaintiff,                   )
                                           )
                  v.                       )        CIVIL ACTION
                                           )        NO. 13-40094-TSH
CAROLYN W. COLVIN,                         )
Acting Commissioner of Social Security     )
Administration,                            )
                                           )
              Defendant.                   )
_____      )
```

## ORDER AND MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE COMMISSIONER'S DECISION (Docket No. 17) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 20)

### March 18, 2015

HILLMAN, D.J.

This is an action for judicial review of a final decision by the Acting Commissioner of the

Social Security Administration (the "Commissioner" or "SSA") denying the application of Kellii

Heleana Lynne Perry ("Plaintiff") for Social Security Disability Insurance Benefits and

Supplemental Security Income. Plaintiff filed a motion seeking an order reversing the decision of

the Commissioner (Docket No. 17), and the Commissioner filed a cross-motion seeking an order

affirming the decision of the Commissioner (Docket No. 20). For the reasons set forth below,

Plaintiff's motion is ***granted***, and Defendant's motion is ***denied***.

### Procedural History

On October 30, 2009, Plaintiff applied for disability insurance benefits under Title II of

the Social Security Act, and supplemental security income under Title XVI of the Social Security

Act. Plaintiff alleges disability on the basis of her bipolar disorder, depression, anxiety, and post-traumatic stress disorder ("PTSD"). The SSA initially determined that Plaintiff was not entitled to disability insurance benefits or supplemental security income on February 19, 2010. Plaintiff filed a written request for a hearing on August 12, 2010, and a hearing was held before Administrative Law Judge ("ALJ") Penny Loucas on February 1, 2012. In a written decision issued on March 12, 2012, the ALJ determined that Plaintiff was not disabled and therefore ineligible for disability insurance benefits and supplemental security income. The Appeals Council denied Plaintiff's request for review of the decision on June 3, 2013, thereby making it the final decision of the Commissioner. Plaintiff filed this action on August 6, 2013.

## Facts

### *Personal and Employment History*

Plaintiff was born on June 29, 1974. *SSA Administrative Record of Social Security Proceedings*, Docket No. 14, at 202 (hereinafter "(R. ____)"). She graduated from high school and attended one year of college in 2004. (R. 235). She has worked as an assistant preschool teacher, cashier, sales associate, and unlicensed daycare provider. (R. 229). She alleges disability since May 1, 2008 and has not worked since that time. (R. 228).

### *Medical Records*

Plaintiff's medical records show that she has suffered from bi-polar disorder, depression, anxiety, and PTSD for many years. Treatment records dating from 2008 indicate that Plaintiff has consistently sought medical help for symptoms of isolation, insomnia, manic episodes, depressed mood and energy, decreased appetite, crying spells, decreased concentration, and poor memory. Her condition is linked to sexual abuse she experienced as a child.

Plaintiff's earliest mental health treatment records are from August 2008, when she was seen at Valley Psychiatric Services ("VPS") in Worcester, Massachusetts. (R. 404-09).[1] She had previously been treated at VPS from August 2007 to January 2008, and returned to VPS after living with her father for several months in Georgia. (R. 404, 406). She presented as fully oriented with normal behavior and speech, good eye contact, normal cognitive abilities, but appeared sad and depressed. (R. 408-09). Plaintiff reported that she had been suffering from depression since age 15, and that she had a significant history of childhood sexual trauma. (R. 404, 408). Therapist Diana Nothe-Taylor, M.A. diagnosed Plaintiff with bipolar disorder and PTSD. *Id.* Plaintiff had a global assessment functioning (GAF) score of 48. (R. 409).

In December 2008 Plaintiff was admitted to the emergency room at UMass Memorial Hospital due to symptoms "consistent with a hypomanic episode," including "poor sleep, sleeping approximately 2 hours a night, increased irritability, increased agitation and anxiousness, feeling overwhelmed due to multiple stressors including parenting stressors, financial stressors and housing stressors." (R. 344). Plaintiff's GAF score was 55, and she was prescribed medication for insomnia and agitation, but did not take it due to its sedating side effects. (R. 344, 347). At her follow-up medical consult with Dr. Rebecca Lundquist on January 16, 2009, Plaintiff was alert and fully oriented with no apparent deficits in attention or concentration. (R. 347). Plaintiff related a long history of depression with her first depressive episode occurring at age 15. (R. 344). She explained that her symptoms also included a "history of difficulty concentrating, decreased motivation, with low energy recently." *Id.* She indicated that she would continue her therapy with Nothe-Taylor at VPS. (R. 348). On February 20, 2009, Plaintiff did not show up for a second follow-up visit at UMass Memorial. (R. 343). Dr.

---

[1] The record indicates that Plaintiff had sought outpatient psychiatric treatment before 2008 with other providers. (R. 345).

Lundquist was able to reach Plaintiff by phone; Plaintiff explained that she did not need to continue treatment at UMass because she was receiving therapy services at VPS. (R. 343).

The medical records confirm that Plaintiff continued to seek treatment at VPS. On February 9, 2009, Plaintiff was seen at VPS and complained of depression, mood swings, and stated that she felt sad and frustrated all the time. (R. 537). Nothe-Taylor's treatment notes observed that she "has been an active participant in [treatment]" and that Plaintiff's "[d]epression often gets in the way of [activities of daily living]." (R. 401). Plaintiff did not show up for a scheduled appointment in April. (R. 536). In May, Plaintiff reported to Nothe-Taylor that she felt less anxious and depressed. (R. 400). The report still noted, however, that Plaintiff's anxiety caused her to lack assertiveness and that her depression "gets in the way of [activities of daily living]." *Id.* In August, Plaintiff reported the same symptoms, and also that she felt helpless and hopeless because she could not find safe housing. (R. 399). Her GAF score was 50. *Id.*

Plaintiff was seen again at VPS in October. She was fully oriented with normal speech and thought content, but her affect was listed as "sad/depressed." (R. 535). It was noted that Plaintiff had not been taking her medication "in months" and had been living in a shelter. *Id.* Plaintiff missed an appointment at VPS in December 2009, and was next seen in February 2010. (R. 533-34). At that point Plaintiff stated that she was feeling better and sleeping well, but had recently taken out a restraining order on her ex-boyfriend. (R. 533). In March, Plaintiff was admitted to Marlborough Hospital after overdosing on sleep medication. (R. 433). Plaintiff denied it was a suicide attempt, but complained of depression, decreased appetite and energy, anhedonia, feelings of guilt, nightmares, crying spells, hypervigilance, decreased concentration and flashbacks. *Id*. She was discharged on March 29, 2010 with diagnoses of bipolar disorder and PTSD and a GAF of 60. (R. 435).

The following day Plaintiff began a day treatment program at South Bay Mental Health Center to help manage her depression and manic episodes. (R. 561). She participated in the program continuously for nine months before asking for time off due to a death in the family. *Id.* She was discharged on December 7, 2010 with a GAF of 46—the same score as upon entry. *Id.* At the time of discharge she was reported to be working hard to achieve her goals and doing well in weekly groups. *Id.* A few days later Plaintiff decided to return to South Bay, and was readmitted to the program on December 13. (R. 618). Upon readmission she stated that she was living comfortably within her means and did not want help finding employment. *Id.*

On March 10, 2011, however, Plaintiff was admitted to UMass Memorial Hospital with increased depressive symptoms and suicidal ideation. (R. 583). She was hospitalized for five days, and responded well to medication. *Id.* Upon entry her GAF was 35, but over the course of the hospital stay her mood improved and she was discharged on March 16 with a GAF of 55. *Id.*

Upon discharge Plaintiff re-entered the South Bay treatment program, stating again that she needed therapy to help control her emotions and anxiety. (R. 639). She did well in treatment, and eventually began mentoring a teenager and helping to run her own group. (R. 640, 643). However, by July Plaintiff reported worsening anxiety because her son was missing, and stated that she was non-compliant with her medication. (R. 642). In August she reported experiencing additional stressors, including the possibility that her son had been arrested, that her family might lose their housing, and that she was expecting an out-of-wedlock grandchild. (R. 643). She requested a break from running her group because she was under "too much pressure." *Id.* Plaintiff's attendance began to drop off and she told counselors that she wanted to be discharged despite not having completed the program. (R. 624). On August 19, South Bay discharged Plaintiff, noting her poor attendance, that she had become disgruntled, and that she was

unresponsive to outreach calls. *Id.* Her discharge records note that she had a GAF of 50, and that she would continue to see her therapist at VPS. (R. 625).

*Medical Opinions*

In September 2009, Plaintiff's therapist Diana Nothe-Taylor, M.A. and Dr. Aaron Leavitt, M.D. completed a mental health impairment questionnaire about Plaintiff. (R. 338-341). They reported that Plaintiff had symptoms of emotional lability, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, hyper-vigilance, social withdrawal or isolation, and apprehensive expectations. (R. 338). They described Plaintiff's difficulty in thinking or concentrating as "constant," noted that she could not go out of the house to appointments, and stated that she has intrusive recollections of traumatic childhood sexual abuse. (R. 339). Further, Nothe-Taylor and Leavitt stated that Plaintiff has poor memory because of trauma, problems with concentration because of flashbacks, is unable to accept criticism without crying, and that Plaintiff does not adapt well to new situations. (R. 340-41). Plaintiff's "significant trauma" was listed as the medical basis for their opinions. (R. 341).

Nothe-Taylor and Leavitt completed a second questionnaire regarding Plaintiff's psychiatric disorders on December 16, 2009. (R. 413). They reported that Plaintiff was not able to function outside of a highly structured living and/or day treatment setting for two or more years, that Plaintiff's depression interferes with her activities of daily living and caring for her children, and that Plaintiff "had to stop going to college because she tended to dissociate for long periods of time." (R. 411). They further stated that Plaintiff cannot sustain concentration and attention for extended periods of time, that Plaintiff needs "constant external cues to be reminded to do chores," that Plaintiff has trouble socializing, panics when traveling in public, and withdraws to her bed for days at a time. (R. 412).

In February 2010, state agency psychologist S. Fiore reviewed Plaintiff's medical records and completed a functional capacity assessment. (R. 431). Fiore noted that Plaintiff had received psychotherapy for several years, and had been intermittently compliant with medication and treatment. *Id*. Her mood was "typically depressed and anxious" and her impairments were "severe." *Id.* However, Fiore concluded that the severe impairments cause no more than moderate functional deficits. *Id.* He opined that Plaintiff can understand and recall simple information, maintain attention and concentration for two hours at a time on a normal workday or workweek, tolerate minimal social demands and simple changes in her routine, avoid hazards, and travel independently. *Id.* These conclusions were reviewed and affirmed by a second state agency consultant, M. Berkowitz. (R. 544).

### *Plaintiff's Hearing Testimony*

Plaintiff appeared before an ALJ by video hearing on February 1, 2012, and was represented by Attorney Robert Schyberg. (R. 32). Plaintiff testified that she first began seeking mental health treatment in 2001 and was diagnosed with bipolar disorder. (R. 58-59). She stated that she was still in therapy, and that she had had five or six therapists since she began seeking treatment in 2001. (R. 59). Plaintiff testified that she had experienced three inpatient hospitalizations related to her mental health. *Id*. She recalled her hospitalization at Marlborough Hospital, which she said was caused by extreme anxiety and insomnia. *Id*. She stated that she had taken some sleep medication, but when it didn't work, took more and ended up in the emergency room. *Id*. Plaintiff was hospitalized for a week, and received mental health treatment that included medication and individual and group therapy. *Id.* Plaintiff had trouble recalling the locations or any details of her other hospitalizations despite being prompted by the ALJ and her attorney with medical records. (R. 61-64).

When asked about her longitudinal treatment history, Plaintiff explained that she had attended therapy with Diana Nothe-Taylor for six years, beginning in 2005. (R. 64-65). While she was seeing Nothe-Taylor, she also began attending the day program at South Bay Mental Health Center. (R. 65). Plaintiff testified that she attended the program from 9 am to 3 pm, Monday through Friday, for almost a year and a half. *Id.* While at South Bay Plaintiff participated in various therapies for trauma, PTSD, and anxiety disorders, and stated that she felt the program was helping her to get better. (R. 65-66). However, she stopped attending because the number of participants in the program grew from 30 or 40 people to 120 people. (R. 66). Plaintiff testified that the number of participants became "too overwhelming," and the program "wasn't providing the same type of services that they started with when I first started going there." *Id.* In fact, Plaintiff said, she started to get worse:

> I started isolating when I got home instead of, you know, trying to – I started reverting back to the way I was when I first started going there, and I stopped going [to South Bay] because of that.

(R. 66-67). Despite ending her treatment at South Bay, Plaintiff continued therapy with Nothe-Taylor. (R. 67). Plaintiff also stated that she was currently seeking therapy from a new and "very good" therapist named Stacy Greenberg. *Id.*

When asked about medication, Plaintiff testified that she was taking a variety of helpful medications, but that she had problems affording the prescriptions. *Id.* Plaintiff also stated that she has difficulty remembering to take her medications, and that her children help remind her by putting post-it notes around the house (R. 68). Finally, Plaintiff testified that she has tried to look for work during the past few years, and also considered going back to school, but her current therapist did not think she was ready to do that because she would have to be around other people. (R. 69).

To be found eligible for either disability insurance benefits or supplemental security income, an applicant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423 (d)(1)(A); 1382c (3)(A).[2] The Commissioner uses a five-step evaluation process to determine whether an applicant meets this standard. 20 C.F.R. §§ 404.1520 (a)(4); 416.920(a)(4). At step one, the Commissioner decides whether the applicant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520 (a)(4)(i); 416.920(a)(4)(i). If not, the Commissioner proceeds to step two. Step two requires the Commissioner to determine whether the applicant's impairment is "severe." 20 C.F.R. § 404.1520 (a)(4)(ii); 416.920(a)(4)(ii).

If the claimant establishes that the impairment is severe, the Commissioner proceeds to step three and determines whether the impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If so, the claimant is conclusively presumed to be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287 (1987). If not, the Commissioner proceeds to step four. Step four asks whether the applicant's residual functional capacity (RFC) allows her to perform her past relevant work. 20 C.F.R. § 404.1520 (a)(4)(iv); 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, he or she is not disabled. If the claimant is unable to perform past relevant work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform

---

[2] For a disability insurance benefits claim, a claimant must establish disability on or before the date last insured to be entitled to benefits. *Cruz Rivera v. Sec'y of Health & Human Servs.*, 818 F.2d 96, 97 (1st Cir. 1986). The ALJ determined that, based on Plaintiff's earnings record, Plaintiff had "acquired sufficient quarters of coverage to remain insured through September 30, 2008." (R. 14).

other work in the national economy in view of [the claimant's] age, education, and work experience." *Bowen*, 482 U.S. at 142, 107 S.Ct. 2287. If the Commissioner fails to meet this burden, the claimant is disabled and entitled to benefits. *Id.*

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 1, 2008. (R. 16). At step two, the ALJ found that Plaintiff had severe impairments of PTSD and bipolar disorder. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17).

In reaching this conclusion, the ALJ considered listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders), including whether "paragraph B" and "paragraph C" criteria were satisfied. *Id*. Evaluating the paragraph B criteria,[3] the ALJ determined that Plaintiff experienced only moderate functional deficits in activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace. *Id*. Further, the ALJ found that Plaintiff had experienced no episodes of decompensation which had been of extended duration. (R. 18). With respect to the paragraph C criteria,[4] the ALJ stated

---

[3] Paragraph B criteria are met when the claimant's disorder(s) result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App. 1. "Marked" difficulty means difficulty that is "more than moderate but less than extreme." *Id.*

[4] For listing 12.04 (affective disorders), paragraph C criteria are satisfied if the claimant has a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. § 404, Subpt. P, App. 1. For listing 12.06 (anxiety-related disorders), paragraph C criteria are satisfied if the claimant's anxiety-related disorder "result[s] in complete inability to function independently outside the area of one's home." *Id.*

that the evidence failed to establish that the criteria were satisfied. *Id.*

At step four, the ALJ found that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c),[5] including frequently lifting twenty-five pounds and occasionally lifting fifty pounds, with the following restrictions:

> would be limited to unskilled work with no more than occasional interaction with the general public, would require supervision with a supervisor having to check up on her twice a day, could adapt to routine changes in the workplace setting and make/carry out simple plans, would require a position without production quotes, would be limited to simple routine minor changes in the workplace setting, would be incapable of exercising any judgment and could not work in a team environment.

(R. 18). In reaching this conclusion, the ALJ found that Plaintiff's subjective description of the severity of her condition was not credible in light of her medical treatment history, and gave "significant weight" to the opinions of the state agency consultants. (R. 20-24). The ALJ also found it significant that Plaintiff had exhibited an ability to respond well to treatment, as demonstrated by a greatly improved global assessment functioning score upon discharge from her most recent hospitalization. (R. 24). Given Plaintiff's RFC, the ALJ determined that Plaintiff was unable to perform any past relevant work. *Id.* At step five, however, the ALJ found that, considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 25). Therefore, Plaintiff was not disabled. (R. 25-26).

## Discussion

### *Standard of Review*

Review by this Court is limited to whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the correct legal standards. *Manso-Pizarro v.*

---

[5] Medium work is defined as "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c); 416.967(c).

*Sec'y of Heath & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). When applying the substantial evidence standard, the court must bear in mind that it is the province of the Commissioner to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts about the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

Reversal of an ALJ's decision by this Court is warranted only if the ALJ made a legal error in deciding the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004). If the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record could arguably support a different conclusion. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

## *The ALJ's evaluation of Plaintiff's credibility*

In determining whether a claimant is disabled, the ALJ must consider statements or reports from the claimant regarding their symptoms and functional limitations. 20 C.F.R. § 404.1529(a); 416.929(a). However, a claimant's subjective description of symptoms alone cannot establish disability; the ALJ must also consider any other available evidence, including objective medical evidence, to determine whether the claimant's testimony is consistent with the remainder of the record. 20 C.F.R. § 404.1529(a), (c); 416.929(a), (c). *See also Grady v. Astrue*, 894 F. Supp. 2d 131, 142 (D. Mass. 2012). Evaluating the entire record in this manner requires the ALJ to make a finding about the credibility of a claimant's statements. SSR 96-7p, 1996 WL

374186 at *1. The ALJ's credibility determination "is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987).

Social Security Ruling 96-7p explains how an ALJ must evaluate a claimant's credibility under the relevant regulations. *See* SSR 96-7p, 1996 WL 374186. The ruling generally requires an ALJ to consider a claimant's statements regarding symptoms in light of the entire record, and to include in the decision specific reasons for the credibility finding that are supported by evidence.[6] *Id.* at *2-4. The ruling further provides that a claimant's medical treatment history may either corroborate or discredit a claimant's description of symptoms. *Id.* at *7-8. However, adjudicators are specifically limited in their ability to draw negative inferences from treatment history:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

*Id.* at *7. In this case, the ALJ's decision rested heavily on the finding that Plaintiff's statements about her symptoms were not fully credible. The ALJ reached this conclusion by drawing several negative inferences from Plaintiff's treatment history. The ALJ relied on these

---

[6] The regulations require an adjudicator to consider the following factors when evaluating the nature and severity of a claimant's symptoms: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 1529(c)(3); 416.929(c)(3); SSR 96-7p, 1996 WL 374186 at *3; *see also Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986) (describing factors ALJs must consider in evaluating a claimant's subjective description of pain).

negative inferences at steps two and three of the disability determination process.[7] For example, at step two, the ALJ stated:

> Review of the record indicates the claimant's statements are no more than partially credible as the available evidence does not fully support her claims of such severe functional deficits. The claimant has received mental healthcare for several years and has been only intermittently compliant with treatment.

(R. 17). At step three, the ALJ observed that "***[b]y July 2011, the claimant was again non-compliant with medication***," (R. 22) (emphasis in original), and that "*she remained unresponsive to outreach calls*" upon leaving the South Bay program in August 2011. (R. 23) (emphasis in original). These facts indicated to the ALJ that Plaintiff's "symptoms are not as severe as she has alleged and the issue of secondary gain cannot be ignored." *Id.* A few paragraphs later, the ALJ expressed this view again:

> Based on the entire evidence of record, the undersigned finds the claimant not entirely credible. She has not been consistent with therapy and has bounced around between five and six therapists, stopping all treatment in August 2011. . . . The claimant has been receiving treatment, but she voluntarily tends to be non-compliance [sic] with scheduled appointments and medication.

*Id.* Despite the significant negative inferences drawn from Plaintiff's treatment history, the ALJ's decision does not consider, as Social Security Ruling 96-7p requires, explanations for the irregularities in Plaintiff's treatment history. *See* SSR 96-7p, 1996 WL 374186 at *7. The case record is replete with such explanations. With respect to her medication, Plaintiff testified that she often forgets to take her prescriptions and that her children leave post-it notes around the house to remind her. (R. 68). This explanation is consistent with evidence throughout the record that Plaintiff suffers from poor memory due to her bi-polar disorder and PTSD, yet it is not referenced in the ALJ's decision. Plaintiff also testified—in direct response to a question from

---

[7] SSA regulations provide that if a claimant is not engaged in substantial gainful activity, adjudicators "consider your symptoms, such as pain, to evaluate whether you have a severe physical or mental impairment(s), and at each of the remaining steps in the process." 20 C.F.R. §§ 404.1529(d), 416.929(d).

the ALJ—that she had difficulty affording her medication. (R. 67). This testimony is not mentioned by the ALJ either.[8]

With respect to therapy attendance, Plaintiff testified that she left the South Bay program because as the number of participants grew, it became "overwhelming" and her condition worsened. (R. 66-67). This complaint is consistent with numerous medical records suggesting that Plaintiff's mental impairments make it difficult for her to be around lots of people. *See, e.g.*, (R. 412) (therapist Diana Nothe-Taylor reporting that Plaintiff does not get along with coworkers, has trouble socializing with friends, panics when traveling in public, and withdraws to bed for days at a time). This explanation was not considered in the ALJ's decision.[9] Further, the ALJ failed to consider that Plaintiff's symptoms of social withdrawal and isolation, increased anxiety in public, and dissociative episodes could themselves explain missed appointments or other treatment irregularities.

The failure to consider these several plausible explanations for irregularities in Plaintiff's treatment history is particularly problematic. If an adjudicator were to find the explanations credible, the record would show that Plaintiff has consistently made attempts to seek medical help and follow prescribed treatment for several years. The SSA itself has stated that a longitudinal medical record showing consistent attempts at treatment supports a claimant's description of severe symptoms. Social Security Ruling 96-7p states:

> Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatments sources may be a *strong indication* that the symptoms are a source of distress

---

[8] The ALJ's decision does recite that Attorney Schyberg represented that Plaintiff was unable to afford her medication, but provides no indication that this explanation was actually considered, or if so, why it was discounted.

[9] Plaintiff also testified, and the record indicates, that she continued to attend sessions with her therapists even after leaving the South Bay program. (R. 67, 625). This evidence directly contradicts the ALJ's observation that Plaintiff "stopp[ed] all treatment in August 2011." (R. 23).

to the individual and *generally lend support to an individual's allegations* of intense and persistent symptoms.

SSR 96-7p, 1996 WL 374186 at *7 (emphasis added). Thus, consideration of the explanations for irregularities in Plaintiff's treatment history may very well have altered the evaluation of Plaintiff's credibility and, consequently, the ultimate conclusion about severity of her functional limitations.

Consequently, the Court finds that the ALJ's failure to consider the numerous explanations for irregularities in Plaintiff's treatment history constitutes legal error and is grounds for reversal. *See LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377 (6th Cir. 2013) (remanding where ALJ drew negative inference from claimant's failure to seek treatment, but did not consider that claimant had no network providers where he lived and was unable to drive long distances to seek care); *Sincavage v. Barnhart*, 171 F. App'x 924 (3rd Cir. 2006) (remanding where ALJ drew negative inference from claimant's failure to seek counseling, but failed to consider that claimant did not know she could seek psychological treatment without a referral and that claimant lacked insurance coverage); *Calhoun v. Astrue*, 821 F. Supp. 2d 435, 441 (D. Mass. 2011) (remanding where ALJ drew negative inference from claimant's failure to lose weight and quit smoking before surgery, but failed to consider that the surgeon never told the claimant to lose weight or quit smoking before the operation).

### The ALJ's evaluation of medical opinion evidence

An ALJ's evaluation of medical opinion evidence is also subject to specific protocols set forth in SSA regulations. First and foremost, an ALJ must "always consider the medical opinions in [the] case record," and "[r]egardless of its source . . . will evaluate every medical opinion" received. 20 C.F.R. §§ 404.1527(b), (c); 416.927(b), (c); *see also* SSR 96-5p, 1996 WL 374183 at *2 (stating that SSA "rules provide that adjudicators must *always* carefully consider medical

source opinions *about any issue*") (emphasis added). Medical opinions are defined broadly as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). [10]

The regulations also prioritize the opinions of a claimant's treating sources. *See* 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). This "treating source" rule provides that the ALJ should give "more weight" to the opinions of treating sources because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). A treating source is the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502; 416.902. An ongoing treatment relationship exists "when the medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

---

[10] Acceptable medical sources include licensed physicians and licensed or certified psychologists. *See* 20 C.F.R. §§ 404.1513; 416.913.

Controlling weight must be afforded a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.[11] 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). However, an ALJ may discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.[12] *Arruda v. Barnhart,* 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. §§ 404.1527(c)(2)-(4); 416.927(c)(2)-(4); *see also* SSR 96–2p, 1996 WL 374188, at *2.

Further, the regulations require the ALJ to explain the weight given to a treating source opinion and the reasons supporting that decision. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). According to agency policy, the "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2P, 1996 WL 374188, at *5. These rules are not formalities. They are intended to allow "claimants [to] understand the disposition of their cases," and provide a reviewing court with an adequate record to review disability determinations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

---

[11] "Controlling weight" is the term used to describe a medical opinion from a treating source that *must* be adopted by the ALJ. *See* SSR 96–2p, 1996 WL 374188, at *2.

[12] Where controlling weight is not given to a treating source opinion, the ALJ must consider an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.929(c)(2)-(6).

Plaintiff's record contains two sets of medical opinions. The first is that of the non-examining state agency consultants, S. Fiore and M. Berkowitz.[13] Based on their review of Plaintiff's medical records, they opined that her bipolar disorder and PTSD caused "no more than moderate functional deficits," and Plaintiff's description of her symptoms was only partially credible. (R. 431). The ALJ considered this opinion evidence, and gave it "significant weight." (R. 23). The written decision relies heavily on the state agency consultants' conclusions at both step two and step three of the disability determination. In fact, the ALJ's analysis of step two uses language taken largely verbatim from the opinion submitted by S. Fiore. *Compare* (R. 17) *with* (R. 431).

In contrast, the decision makes no mention of the second set of opinions from Plaintiff's treating sources, therapist Diana Nothe-Taylor and Dr. Aaron Leavitt, M.D. They jointly completed two separate mental health questionnaires regarding Plaintiff's functional limitations, dated September 2, 2009 and December 16, 2009, respectively. (R. 338-41, 411-13). On both occasions, Nothe-Taylor and Dr. Leavitt provided the opinion that Plaintiff experienced significant functional limitations as a result of her bipolar disorder, PTSD and depression. On the first questionnaire, they described Plaintiff's difficulty in thinking or concentrating as "constant," noting that she could not go out of the house to appointments, had poor memory because of trauma, problems with concentration because of flashbacks, was unable to accept criticism without crying, and did not adapt well to new situations. (R. 340-41). On the second questionnaire, they stated that Plaintiff could not sustain concentration and attention for extended periods of time, needed "constant external cues to be reminded to do chores," and that she had

---

[13] Evaluation of state agency consultant opinions is governed by the same rules as those for other opinion evidence, plus additional requirements set forth in 20 C.F.R. §§ 404.1527(e); 416.927(e).

trouble socializing, panics when traveling in public, and withdraws to her bed for days at a time. (R. 412).

There can be no doubt that both questionnaires constitute medical opinions requiring analysis under the treating-source regulations described above. The medical records make clear Plaintiff had an ongoing treatment relationship with Nothe-Taylor for several years at Valley Psychiatric Services. (R. 393-410, 625). Leavitt and Nothe-Taylor are acceptable sources for a medical opinion because they are a "licensed physician" and "licensed or certified psychologist." *See* 20 C.F.R. §§ 404.1513; 416.913. The statements in the questionnaires fit the regulatory definition of medical opinions because they reflect medical judgments about the severity of Plaintiff's symptoms and limitations. Indeed—the first questionnaire specifically asks the respondents to provide a "*clinical opinion* regarding your patient's ability to perform the activities listed below in a work setting during a normal eight hour work day." (R. 340) (emphasis added). Finally, it is of no consequence that the questionnaires appear to have been completed in conjunction with Plaintiff's prior applications for state disability benefits instead of the instant application for social security benefits. *See* (R. 338). The regulations merely state that "[e]vidence that you submit or that we obtain may contain medical opinions," and do not differentiate between type or purpose of submitted opinions. 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2).

The ALJ's written decision does not evaluate these treating source opinions at all. Although the decision references the symptoms listed on the September questionnaire, (R. 22), the ALJ did not analyze it as medical opinion evidence. The decision makes no mention of the December questionnaire whatsoever. This failure violates the SSA's assurance that it will evaluate every medical opinion received, as well as the regulations requiring special analysis of

treating source opinions. *See* 20 C.F.R. §§ 404.1527(b), (c); 416.927(b), (c). The omission of any reference to the opinions of Nothe-Taylor and Leavitt is even more significant given that the regulations favor treating source opinions, and in this case, the treating source opinions corroborate Plaintiff's own statements about her symptoms. This is no small error, because if the opinions had been properly evaluated by the ALJ, the weight of the evidence could have shifted in Plaintiff's favor.

This Court and others will not hesitate to reverse and remand determinations of non-disability when an ALJ does not adhere to the requirements set forth in the SSA's own regulations. *See McCumber v. Colvin*, No. 13-CV-11666-TSH, 2014 WL 4804750 (D. Mass. Sept. 25, 2014) (remanding where ALJ's decision did not evaluate medical opinions of the plaintiff's treating sources pursuant to 20 C.F.R. § 404.1527); *Halloran v. Barnhart*, 362 F.3d 28, 33 15 (2d Cir. 2004) ("[W]e will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). This is especially true in cases like this one, where the Court has no way to determine how, or even if, the ALJ considered a treating source opinion that supports Plaintiff's description of her symptoms and functional limitations.

<u>*Nature of Relief*</u>

Ordinarily, a district court can order the Commissioner "to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or to deny benefits." *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001). Where legal error clarifies the record such that awarding benefits is the clear outcome, the court may order payment. *Id.* However, if an essential factual issue has not been resolved, the court should remand for further proceedings. *Id.*

The question in this case is a close one. Remedying the legal errors identified above leaves a record that appears to substantially support Plaintiff's description of severe symptoms and functional limitations. However, the Court recognizes the important role served by ALJs in weighing evidence, determining issues of credibility and drawing reasonable inferences from the record in the first instance. Given that the weight of competing medical opinions and Plaintiff's credibility are central to the disability determination in this case, the Court will remand for a new hearing and further proceedings consistent with this opinion.

## Conclusion

For the reasons set forth above, Plaintiff's Motion for Order Reversing the Commissioner's Decision (Docket No. 17) is ***granted*** and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket No. 20) is ***denied***. The case is remanded for a new hearing and further proceedings consistent with this opinion.


SO ORDERED.



/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE